Good morning. Good morning, Mr. Conner. My name is Tommy Conner. I'm with the Law Offices of Tommy Conner and I represent the plaintiff and appellant S.N. Could you speak up a little bit? You have a nice, soft voice, but we need to be able to hear you. Certainly, Your Honor. I represent S.N. Sands. Imagine it's your grandfather and trying to get the point across to him. And come out with it. Okay. The briefing sets forth all the issues and I'd be pleased to answer any questions that you might have. In the absence of questions, I'll make a few points. In San Francisco, truck services are brokered, commonly. That is the norm. The various trucking companies throughout the city have a certain number of trucks either under contract or that they can use as independent contractors. So the way it works every morning is whoever needs services calls up and requests a certain number of trucks. And for S.N. S., if I run out of trucks, I simply then broker someone else's trucks. And everyone in the industry works this way. Now, Alan French testified, he's an employee for Hansen, Vice President of Hansen, and he says, using truck brokers to broker trucking services. And how does Hansen ensure that the local trucking aspects are being complied with? They count the trucks that are driven by truckers who fit the local trucking definition of the lease. They don't care whether it's brokered or not. And in his testimony, and it's in the record, it's under seal, and I'm sure you have it, he says, he refers to Bodie. He says, you know, Bodie might have brokered the trucks, but we'll credit that truck as an MBE or a local truck if, in fact, the driver of that truck complies, if they're a local trucker, if they fit. So this argument around illegality is that there was somehow either a wrongful purpose or, in practice, it would have been illegal if, in fact, Walker had a contract to receive the trucking and if he used S&S to broker those trucking services. Well, if so, that would mean that what's happening right now is illegal in practice, if, in fact, the purpose of the contract that Walker solicited, received, and drew S&S into was itself illegal. Forgetting the illegality for the moment or putting it aside and assuming that there was something illegal about it, where is there evidence that indicates that Walker, that British Pacific did anything more than give Walker a trading contract, a trucking contract, and approved Walker's dealing with Sands? In other words, or put differently, what is there that shows that Sands was an intended beneficiary of a contract? Two things, Your Honor. At page 609 of the record, we have the writing from Mr. Chambers, the President of British Pacific, to Hansen, in which he says, at paragraph 2, In subsequent discussions with CW Trucking and agreed to by BREPAC, CW Trucking was sharing the local trucking responsibilities with S&S Trucking. Yes, that's true. Yes. In the declaration of Steve Navarro, he says he sat down with Chambers and said, Okay, we're going to be doing the trucking along with Walker. Mr. Connolly, that's not inconsistent with anything you just told us about the way that the trucks are brokered in San Francisco. That is that it's generally understood, if you get the contract, that you may use other trucks that have other logos on them, and that's an accepted practice. But that doesn't mean that you have a contract with other trucks that are involved through that brokering process. By that, Your Honor, do you mean that it doesn't mean that there's an agreement between Charlie Walker and S&S? Right. Which would make S&S an intended beneficiary? That's correct. It would be well understood that if you were going to hire Walker to broker to get the truck deal, that in the process, if he runs out of trucks someday, that he's going to go over to S&S or anybody else he can find in the city on this preexisting brokering deal and go and get somebody else's trucks. And as long as Walker's providing trucks to the pier, nobody's going to care what logo they've got. But that doesn't mean that the pier has a contract. The BP's got a contract with anybody else except for Walker. The question on intended beneficiary, Your Honor, is whether BP knew that this contract would benefit S&S. If you will read back the declaration of Steve Navarro, he testifies that he sat down with Chambers and said, us, S&S, you're entering into this agreement for us so that we can neither have the trucks nor the brokering services. He doesn't have the capacity. It's undisputed. He had two trucks and no brokering service whatsoever. No ability. Now if I'm sitting down with a man who I'm asserting knows, intends for me to benefit from the contract he enters into with another, and I say, you know in California this agreement's enforceable and you know I'm going to rely on it, I'm going to do the brokering services, and that man says, that's fine, and then writes a letter in which he confirms that this is going to benefit S&S. S&S is going to participate in this process. He doesn't say, it's going to be brokered and Charlie will use trucks throughout San Francisco. Then I'd understand your point. It says specifically, S&S will be participating with Charlie Walker. Now if that's not an intention to benefit S&S, what would be? At that point, why didn't S&S demand the honest thing to get their name onto the contract? Onto what contract? This was all oral. We have a problem. You can see from the record that Charlie Walker shifts back and forth. And I can appreciate that you might say, well, if he's not a good guy then that should wash over to S&S. S&S is not a good guy either. And if it in fact thought it had a contract, it would have required some kind of writing and therefore there's an inference that it never had a contract. If that's the angle you're taking, Your Honor, first, I don't think that's an issue. On de novo review, we can take in any evidence that's in the record. But if the inference is there wasn't a contract, an oral contract, because S&S didn't ask for a written one, then the written agreement that S&S entered into with Charlie Walker, which is 508, wouldn't have been necessary. It comes after these discussions. It's evidence that S&S believed it had an agreement and felt that it had to authenticate it with Walker. As to a writing with Chambers, the evidence of the record indicates that British Pacific orally modified its written and integrated agreement with Charlie Walker to get him to seek an asphalt batch plant and paid him extra money for it, and it's undisputed. It's from the declaration of Steve Navarro clear that he was pushing on Chambers to come forward with as much as he could get Chambers to come forward to, but there was resistance in it. Now, I don't read from the record that his failure to say, will you give me a written contract, means that there was either no agreement or implies that there was no agreement with Walker and British Pacific or that there was no agreement between S&S and Walker or S&S and British Pacific, because the documents clearly reflect those agreements. It is for purposes of this case, I believe, undisputed that there was an agreement between S&S and Walker on the very point. It's undisputed in the record that Mr. Navarro sat down with Mr. Chambers and effectively told him, we're entering into an oral agreement, and it's enforceable, and I want you to confirm it. That's undisputed. But the suit isn't about a direct contract between S&S and Walker. Well, we have the amendment problem. I know. I understand that. But what's in the pleading is not. It's a third-party beneficiary of an enforceable contract. Absolutely correct, Your Honor, and I stand on the prior argument. I won't repeat it. Okay. What do you folks need to hear about? I could talk about what's in the written record, but my preference is to hit your issues. Well, you just heard mine. Okay. Do you want me to – should I say any more? You may want to just take a seat and see what your opponent says and come back. You're free to do that. I'll take your advice, Your Honor. There's a little over 10 minutes remaining. Thank you. Thank you. Good morning. May it please the Court. I'm William C. Wilka. I'm the attorney for the Applee British Pacific Aggregates Limited. And I wish first to address something that Mr. Conner stated in his remarks about how the brokerage works in San Francisco. And I don't believe that there was testimony in the record about how the brokerage works and describing it in the fashion that Mr. Conner just did with respect to brokering being so common and being handled the way that was described. But whether or not brokering is what he believed, his client believed he was going to get, the facts are undisputed that the San Francisco ordinance in question states that local truckers means those truckers that are certified as local business enterprises. And that's at And are certified, the language used by the legislature, by the local legislature, doesn't mean they were certified in the past, doesn't mean they have an application to become certified in the future. It means they are certified. And the evidence is undisputed that Mr. Walker was not certified during this time period. And in fact, the evidence is in the record that S.N. Sands was not certified at the time of this motion. Sands had been certified and then was decertified. And that is, was admitted by Mr. Navarro in his deposition testimony. And I can refer you to the record for that. That's ER 172.13 to ER 173, line 3. And that the notice of decertification of Sands is in the record at ER 361. And indeed, if one were to check the website of the Human Rights Commission, which according to the testimony in the record of Virginia Harmon, the Executive Director of the Human Rights Commission, is maintained on a current basis, is accurate, and is their method of certified. And so Ms. Harmon says that that record on their website is an accurate current statement. Sands is not certified even today, according to their website. Mr. Wilker, let's suppose that BP had entered into a contract with Mr. Walker. S.N. Sands is not a part of this at all. So take them out of the equation. So it's just a straight Walker and BP contract. Walker says, I'm going to provide you with the services. I'm going to provide you with the trucking services. Are you talking about a written contract? Fine. A written contract. I'm going to do this. And it turns out that Walker comes back and says, BP says, hey, where are the trucks? They didn't show up. And Walker says, I decided not to do this. And BP says, you can't do that. And Walker says, I've got a defense. I'm not certified. The contract's illegal. Is that a good argument? BP doesn't have an action for breach of contract there. And Walker's out of this because the contract is illegal because he didn't have a certificate at the time he entered into the contract? Interesting hypothetical. And two responses to that. One, I believe that the illegality is to be used as a shield, but not a sword, if you will. Not affirmatively by someone in Walker's position. And certainly the cases arise in the other context. The bed and bath and beyond. The fuel and Dawes and those cases. And then secondly, I believe British Pacific would have an action against Mr. Walker, at least to the extent of reliance damages and losses incurred in engaging with him rather than engaging someone else who was licensed and any losses they could demonstrate from that. But I do not believe that they would be entitled, for example, to a specific performance by him of those services when he was not permitted to provide those services. If that's responsive to your question. Even if all he had to do, even if he was perfectly qualified and simply hadn't gone down and gotten the certificate re-stamped or all he had to do was just walk down to the office and get it to pick it up? Unfortunately for Mr. Walker or for Mr. Walker in that hypothetical, it's not that simple. There is testimony in the record by Ms. Harmon of the Human Rights Commission to the extent that the process is a very elaborate process. It takes several months, requires the submittal of a great deal of information, including financial information by the applicant and an analysis of staff. It includes a determination not only that the individual may be a minority or a woman-owned business, but that their annual income for the previous three years does not average more than a certain threshold level because the intention of the statute is to benefit disadvantaged businesses. It's not available to the more profitable or the more successful businesses out there. You have to be under a certain radar screen even to qualify. And so there's a great deal of examination that goes in to determine that that's the case and somebody is not playing games with the statute, if you will. And Mr. Walker testified in deposition that he had been certified for a very brief period of time, approximately 30 days at one point, had been decertified and had never applied for recertification. Whether hypothetically he could have qualified some days is something we can guess on, but in terms of deciding this case, he was not certified. And so with the record before the Court at the time it made its decision and in the record today, Mr. Walker does not meet the statutory requirement. The other thing I want to point out, the other point that I wanted to make sure we addressed is simply the burden and that the burden is on Mr. or is on Sands, Mr. Navarro is the principal. The burden is on Sands to demonstrate that there was a valid existing contract between Walker and British Pacific. And Sands has not and cannot meet that burden primarily because of Walker's lack of legal ability to enter into the contract. It would be an illegal contract. Secondly, as we discussed in our papers, in our answering brief, the agreement with Walker, the alleged oral agreement that Walker claims for, quote, the trucking was subsequent to the written agreement with the British Pacific and is barred by the integration clause in the terms of that written agreement. So under no scenario would Mr. Walker be able to establish a valid and enforceable contract with the British Pacific. Sands' burden is to prove such a contract. It cannot do so. Therefore, its second claim for relief for breach of contract must fall. And third claim for interference with contract depends on that as well, and that must fail as well. Okay. Thank you. I think there are no further questions for you, Mr. Conner. I should make one more point. I did make a reference to the website for the Human Rights Commission. I have the URL citation if you would like it. Thank you. Okay. Thank you. All right. The facts that he raises are not disputed. The importance of them is disputed, the materiality. Virginia Harmon testified that if a trucker is certified at the time it receives the job, it doesn't matter if it becomes decertified later, which I think is directly material to this issue. S&S was certified at all relevant times, which are all times in which it asserts it was a third-party beneficiary of the contract between Charlie Walker and BP, and that's undisputed in the record. Additionally, Fuels v. Dawes tells us that the brokerage case tells us that even if you don't have a license at the time you enter into the contract, if you can get that license before you perform those services, the contract is not illegal. Here, Charlie Walker did not have a license at the time that he entered into the agreement with BP. Hansen does not have a license. Hansen uses brokers that do not have licenses. Hansen uses truckers that do not have licenses. Let's not forget, the lease requires 60 percent local trucking, not 100 percent. So anyone could enter into an agreement for trucking, and it wouldn't be illegal. They don't have to be licensed to enter into an agreement for trucking. They have to be licensed if they want to be one of those credited to attain 60 percent. And that's how Hansen's applying it today, and there is no objection by the city. So this question about certified, decertified, that's just throwing dirt. The bottom line is this. S&S was certified at all material times. Virginia testified, Harmon, and she's the one to know. She heads up the commission. She testified that that's good enough, and that as long as that contract is in existence, S&S could have performed it, which under the lease I think is 25 years if you take all the extensions. I'm not asserting that that's correct. That's just my memory. It's a long term. So damages would be certainly relevant. On your question, Your Honor, pages 399 and 400 of the record are Charlie Walker's deposition testimony. And the topic that's going on here is the question of whether British Pacific threatened him in some way, and he just talks about the money. He says, No, no, they wouldn't give me the $33,000 unless I wrote a letter disclaiming that I had the agreement, which is in print, well, is referred to in print. He goes on to testify to this question. So are you saying that they told you, made some statement to you about not getting the trucking after March 23rd? Answer, I don't know. It came up in conversation. During the time this letter was made, they got unhappy. That's my letter. We had made an agreement with S&S. We. Okay, that could have been Charlie Walker. It could have been British Pacific. And they had made an agreement with S&S. And then they decided that it would be easier to deal with me than it would S&S. And they said, We'll do the same thing except we would rather just deal with you. We don't want to deal with S&S. I said, Why don't you deal with S&S? They said, We just don't want to deal with them. It's easier to do business with you. And I said, Well, I'm still going to need them. You know, I'm going to still need them. And there's no way for me to have a job that's going to take 30, 40 trucks a day. I've still got to go to them. And then there's more testimony. Now, if you add that, Your Honor, into the record, into Mr. Navarro's declaration where he says, I sat across from Mr. Chambers and said, You're entering into an agreement with us as well. Now, can we make a reasonable inference that at the time it entered into the agreement with Charlie Walker, which precedes these discussions, and at the time Charlie Walker told them, I will need S&S, that Mr. Chambers, on behalf of British Pacific, knew that if he agreed with Mr. Walker that it was going to benefit S&S and that he intended it to do so so that he could satisfy his own business objective? The standard of review here, obviously, you know this stuff, but I'll just say it for the record. We need to give life to the facts that most benefit S&S because this is summary judgment. The issue here is whether we get to put on our case. Now, I completely acknowledge this is not going to be an easy case if we're given the right to go forward. Third-party beneficiary under an oral contract, modifying a written contract, everything is stacked up against us from the get-go. That doesn't mean, however, that the summary judgment, the order granting summary judgment is right, just because it burdens the trial court and perhaps the judge doesn't even want this case in her court. And I respect that. That's not at issue. That's not before us. The question is whether the facts interpreted in the light most favorable to S&S give rise to disputed issues of fact on which we could sustain our burden, and they do. The record provides that. Thank you. Okay. Anything else? No. Thank you, counsel, both of you. I appreciate the argument, and the matter just argued will be submitted. Turn next to Mendoza v. Ashcroft. I'm good to go.
judges: Rymer, Hawkins, Bybee